943 P.2d 738 (1996)
189 Ariz. 378
A.H., a minor, By and Through her, guardian ad litem, David D. WHITE, Plaintiff-Appellant,
v.
ARIZONA PROPERTY AND CASUALTY INSURANCE GUARANTY FUND, a subdivision of the Department of Insurance of the State of Arizona, Defendant-Appellee.
No. 1 CA-CV 96-0049.
Court of Appeals of Arizona, Division 1, Department D.
October 29, 1996.
As Amended January 24, 1997.
Reconsideration Denied January 24, 1997.
Petition for Review Denied and Petition for Review Granted in Part September 16, 1997.
*740 Solomon, Relihan & Blake, P.C. By Frank M. Sandler, Kevin J. McAlonan, Phoenix, for Plaintiff-Appellant.
Shimmel, Hill, Bishop & Gruender, P.C. By Scott J. Richardson, Glenn B. Hotchkiss, Phoenix, for Defendant-Appellee.
Appellee's Petition for Review Denied and Appellant's Petition for Review Granted in Part September 16, 1997.

OPINION
SULT, Presiding Judge.
On November 2, 1990, A.H. ("appellant"), a minor, was injured in an accident involving *741 her mother's car and a car driven by Thomas Sroka. Both appellant's mother and Sroka were negligent in causing the accident. Old Hickory Casualty Insurance Company ("Old Hickory"), domiciled in Louisiana, insured appellant's mother with liability and underinsured motorist policy limits of $15,000 per person. Great Plains Insurance Company ("Great Plains"), domiciled in Nebraska, insured Sroka with liability policy limits of $15,000 per person. Appellant obtained a final judgment declaring that her total damages were $65,000, for which Sroka was 60% at fault ($39,000) and appellant's mother was 40% at fault ($26,000).
After the accident, a Nebraska court declared Great Plains insolvent. Pursuant to Arizona Revised Statutes Annotated ("A.R.S.") sections 20-661, et seq., the Arizona Property and Casualty Insurance Guaranty Fund ("the Fund") succeeded Great Plains. The Fund paid appellant the $15,000 limit on the Great Plains policy for Sroka's liability.[1]
On August 19, 1991, an Old Hickory claims adjuster offered appellant the $15,000 liability policy limit to settle appellant's claim against her mother. On August 22, 1991, three days after Old Hickory's settlement offer, a Louisiana court placed Old Hickory in conservatorship, entering an injunction which prohibited Old Hickory and its officers, directors, agents, and employees, and anyone professing to act on its behalf, from "disposing of any of the property or assets of [Old Hickory] and from the transaction of the business of [Old Hickory] except with the concurrence of the Commissioner of Insurance until further written order from this Court." On October 17, 1991, the Louisiana court entered a consent order which, inter alia, incorporated the prohibitions of the injunction.
Nineteen days after the August 22 injunction, appellant attempted to accept Old Hickory's settlement offer for her mother's liability policy limits. Appellant's counsel contacted the same Old Hickory claims representative who had made the offer. Following a discussion, counsel communicated an acceptance of the offer.
On March 15, 1994, appellant filed this action against the Fund, seeking enforcement of her settlement agreement with Old Hickory.[2] The matter first went to arbitration, where appellant was granted summary judgment and awarded the $15,000 policy limit on her mother's liability coverage, as well as attorneys' fees, costs, and prejudgment interest. The Fund appealed the arbitrator's decision to superior court. The Fund also filed an amended answer containing a counterclaim seeking a declaration that A.R.S. section 20-673(B) (1990) prevented appellant from recovering further from the Fund under both the liability and the underinsured motorist coverage on the Old Hickory policy. Appellant filed a reply to the counterclaim as well as her own "Compulsory Counterclaim," seeking the $15,000 policy limit for her mother's underinsured motorist coverage, in addition to the $15,000 liability coverage.
Both parties filed motions for summary judgment. After oral argument, the trial court found for the Fund, holding that: (1) there was no enforceable settlement agreement between appellant and Old Hickory, and (2) section 20-673(B) required that appellant's previous recovery of $15,000 from the Fund under the Great Plains policy be offset against any recovery due from the Fund under the liability and underinsured motorist coverages of the Old Hickory policy. The court also awarded the Fund $10,108 in attorneys' fees and costs. Appellant timely appealed.

ISSUES
1. Did the trial court err in holding that the agreement settling appellant's claim for her mother's liability coverage was unenforceable?
2. Did the trial court err in holding that A.R.S. section 20-673(B) requires that any recovery from the Fund, under either *742 mother's liability coverage or underinsured motorist coverage, be reduced by the $15,000 the Fund has already paid to appellant pursuant to the Great Plains policy?
3. Did the trial court err in awarding the Fund attorneys' fees pursuant to A.R.S. section 12-341.01?

DISCUSSION

I. Settlement
The Fund is required to honor settlement agreements reached by an insurer before insolvency. Betancourt v. Arizona Property & Casualty Ins. Fund, 170 Ariz. 296, 299, 823 P.2d 1304, 1307 (App.1991). In the present case, however, although Old Hickory had made an offer of settlement before it was declared insolvent, the trial court found that, at the time appellant attempted to accept Old Hickory's offer, the injunction prevented Old Hickory from disposing of assets and transacting business without the concurrence of the insurance commissioner. The court then found that because the insurance commissioner never concurred in the settlement, the attempted acceptance was ineffective and no enforceable agreement arose.Appellant presents two theories in support of her argument that the trial court erred. She first argues that in Guarisco v. Haskins, 640 So.2d 575 (La.App.1994), a Louisiana appellate court found enforceable a settlement agreement between Old Hickory and another policy claimant entered into while the same injunction was in effect. Appellant urges that since Louisiana was enforcing Old Hickory settlement agreements without regard to the injunction, we should do likewise.
As the Fund points out, however, the Guarisco court never mentioned the Louisiana injunction. For all we know, the injunction may not have been an issue, the insurance commissioner may have concurred in the settlement, or perhaps the party opposing the settlement never spotted the issue. For these reasons, Guarisco is of no assistance in resolving the instant case.
Appellant next attacks the trial court's finding that the insurance commissioner never concurred in the settlement. Appellant asserts that the injunction required the insurance commissioner to take possession of Old Hickory's business and conduct its affairs. Because the same agent that had made the original offer was still in the office when appellant accepted the offer, appellant argues that the trial court should have presumed that the agent was acting with the commissioner's consent or at least have found a triable issue on this point.[3]
The Fund, however, produced an affidavit from Robert Carter, an employee of the Louisiana Department of Insurance. Carter is the estate manager assigned to Old Hickory, acting "on behalf of the Louisiana Commissioner of Insurance who has been appointed to liquidate the assets of Old Hickory." In his affidavit, Carter averred that he was personally familiar with the legal proceedings initiated by the insurance commissioner against Old Hickory. He further averred that the commissioner had never concurred in the settlement with appellant.
Appellant produced no evidence controverting Carter's affidavit. She instead attacks its admissibility. She claims that the affidavit, which was served as part of the Fund's motion for summary judgment, was the first official notice of the Fund's intent to use Carter as a witness at trial. She argues that Carter's testimony would not be admissible at trial, however, because the Fund failed to timely disclose Carter as a witness. See Ariz.R.Civ.P. 26.1(c) (the court shall exclude at trial any evidence not timely disclosed). *743 Because Carter's testimony is inadmissible at trial, she reasons, the court should not have considered his affidavit in ruling on the Fund's motion for summary judgment. See Ariz.R.Civ.P. 26.1(c).
The Fund responds that Rule 26.1(b) requires that a party make an initial disclosure of witnesses the party expects to call at trial. If "new or different information is discovered or revealed," only then is a party required to amend such disclosure to reveal a new witness. Here, the Fund claims that it offered the Carter affidavit after appellant suggested in her motion papers that the insurance commissioner had concurred in the purported settlement. Since this was the first time that appellant made lack of concurrence by the commissioner a disputed issue, the Fund argues that the disclosure of Carter was timely.
We agree with the Fund. Cf. Allstate Ins. Co. v. O'Toole, 182 Ariz. 284, 896 P.2d 254 (1995). Moreover, we note that if the timing of the disclosure prejudiced appellant, she had a ready remedy via a motion for continuance under Rule 56(f), Arizona Rules of Civil Procedure. Appellant concedes this but argues that she did request a continuance from the trial judge in order to depose Carter. However, appellant argues, the trial judge improperly denied the motion.
In Lewis v. Oliver, 178 Ariz. 330, 873 P.2d 668 (App.1993), rev. denied, cert. denied, 513 U.S. 929, 115 S.Ct. 319, 130 L.Ed.2d 280 (1994), we set forth the requirements for a proper Rule 56(f) motion:
[T]he moving party must present an affidavit informing the court of: (1) the particular evidence beyond the party's control; (2) the location of the evidence; (3) what the party believes the evidence will reveal; (4) the methods to be used to obtain it; and (5) an estimate of the amount of time the additional discovery will require.
Id. at 338, 873 P.2d at 676. In the trial court, appellant requested a continuance in her written reply in support of her motion for summary judgment. She did this by stating, "If Mr. Carter were to be allowed to testify, Plaintiff should be allowed an opportunity to depose and cross-examine this witness regarding the `personal knowledge' he claims to have." At the oral argument, appellant's counsel addressed the court, "If you are going to consider his affidavit then we would like the opportunity to depose Mr. Carter or conduct additional discovery, if need be, in Louisiana." At no time, however, did appellant file an affidavit in compliance with Rule 56(f) and Lewis. We therefore find appellant's request for a continuance was properly denied.
Finally, appellant attacks the foundation for Carter's factual averments. Appellant notes that, while Carter claimed he was "personally familiar" with the legal proceedings initiated against Old Hickory, Carter incorrectly stated that the injunction "remained in effect at all times from August 22, 1991, until October 31, 1991 when Old Hickory was declared insolvent and placed in liquidation." Appellant argues that since the Louisiana court's consent order of October 17, 1991 superseded the injunction, this shows that Carter did not have the personal knowledge he claimed and his affidavit should have been given no weight. See Ariz.R. Civ.P. 56(e) (affidavits supporting summary judgment must be based on the affiant's personal knowledge).
We do not draw the same conclusion as appellant. The October 17 order merely served to make the relevant portions of the August 22 injunction permanent. While Carter may have misstated which order was in effect after October 17, it is of much greater significance that he correctly set forth the legal effect of both orders; namely, that Old Hickory was enjoined from disposing of assets between August 22, 1991 and October 31, 1991 when Old Hickory was declared insolvent and placed in liquidation. Additionally, Carter's information was supported by the fact that, as an employee of the Louisiana Department of Insurance in charge of liquidating Old Hickory's assets, he was in a position to have personal knowledge regarding whether the commissioner had consented to the settlement. We find that the trial court did not err in considering the Carter affidavit.
When a party opposing a summary judgment motion fails to produce facts controverting the other party's affidavit, the *744 facts alleged in that affidavit may be considered true. Sato v. Van Denburgh, 123 Ariz. 225, 228, 599 P.2d 181, 184 (1979). Here, appellant produced no facts controverting the Carter affidavit and we find the affidavit dispositive. At the time appellant attempted to accept the Old Hickory offer, appellant's power of acceptance had been terminated by the injunction. See Restatement (Second) of Contracts, § 36, comment (c) (1981) (the power of acceptance may be terminated by supervening legal prohibition). Moreover, the power to accept had not been revived by the Louisiana Insurance Commissioner consenting to the settlement. In sum, there is no genuine issue of material fact that an enforceable settlement agreement ever arose and the trial court was correct in so finding. Orme School v. Reeves, 166 Ariz. 301, 305, 802 P.2d 1000, 1004 (1990).

II. A.R.S. Section 20-673 Offset
We now turn to the trial court's ruling that A.R.S. section 20-673(B) requires that appellant's prior $15,000 recovery from the Fund under the Great Plains policy be offset against the Fund's $15,000 obligation under the limits of both the liability and underinsured motorist coverages of the Old Hickory policy.[4] The purpose of the Fund is to assume, to the extent of its own statutory limits, the "obligations of the insolvent insurer" as if the insurer had not become insolvent. Arizona Property & Casualty Ins. Guar. Fund v. Herder, 156 Ariz. 203, 205, 751 P.2d 519, 521 (1988). Pursuant to A.R.S. section 20-664(A)(1) (1990), the Guaranty Fund Board shall "[i]nvestigate claims brought against the fund and adjust, compromise, settle and pay covered claims to the extent of the fund's obligation." A "covered claim" is an "unpaid claim . . . which arises out of and is within the coverage of an insurance policy" issued by an insolvent insurer. A.R.S. § 20-661(3) (1990). Payment of covered claims may be limited by the nonduplication of recovery provisions in A.R.S. section 20-673.
A nonduplication provision often operates as an "other insurance" clause for guaranty funds. The original purpose of "other insurance" clauses was to protect an insurer from fraudulent recovery and to discourage insureds from overinsuring against a particular loss. State Farm Mut. Auto. Ins. Co. v. Bogart, 149 Ariz. 145, 717 P.2d 449 (1986). These goals have been carried over into the guaranty context, preventing double recovery when multiple policies cover the same loss. Herder, 156 Ariz. at 207, 751 P.2d at 523. The issue here is whether any of appellant's claims pose a danger against which the nonduplication provisions of section 20-673 are designed to protect; that is, does section 20-673 place any limitation on the Fund's obligation to appellant.
The first possible limitation on appellant's recovery is based on subsection (B). The parties submitted this issue to the trial court on the apparent assumption that subsection (B) was applicable. Their arguments primarily disputed the proper interpretation of the offset provision of this subsection. Appellant argued that the recovery should be limited only by the total damages, while appellee argued that a limit-against-limit analysis should be used. However, we conclude that the facts in this case do not implicate subsection (B) at all.
The subsection states, in pertinent part:
Any person having a claim which may be recovered under more than one insurance guaranty fund or its equivalent or who is insured under more than one policy, shall seek recovery first from the fund of the place of residence of the insured . . . or shall first exhaust coverage under such other policy. Any recovery pursuant to this article shall be reduced by the amount of recovery from any other insurance guaranty fund or its equivalent or under another policy.
The first sentence of subsection (B) indicates that it applies to "[a]ny person having a claim *745 which may be recovered under more than one insurance guaranty fund or its equivalent or who is insured under more than one policy." Under this language, subsection (B) applies to three scenarios: (1) a person has a claim which may be recovered under the guaranty funds of more than one state; (2) a person has a claim which may be recovered under more than one "equivalent" to a guaranty fund; and (3) a person is insured under more than one policy.
Here, appellant clearly does not have a claim which may be recovered under the fund of more than one state; rather, both the Old Hickory and Great Plains policies come under Arizona's guaranty fund. Appellee does not argue otherwise. Appellee does assert, however, that the second scenario applies. Appellee argues that the language "or its equivalent" should be interpreted as follows. When a claimant recovers from the Arizona fund under one insolvent insurer's policy, this then renders the fund the "equivalent" of another state's fund when the claimant seeks recovery for the same covered incident under another insolvent insurer's policy. Claimant's attempted recovery under this second policy would be precluded under the nonduplication language of subsection (B). Appellee rationalizes this interpretation by arguing that while this case does not involve guaranty funds of two states, it "easily could have."
We do not find appellee's argument either legally or logically compelling. Rather, the logical explanation for the phrase "or its equivalent" is that when Arizona first created its fund, not all states had such guaranty funds. Moreover, different states had different names for the funds that were created.[5] Thus, the word "equivalent" appears to have been included simply to encompass the various state funds either already created or to be created under whatever name might be given a particular fund. We conclude, therefore, that this phrase does not bring appellant's claims within subsection (B).
Appellee next argues that this case falls under the "other insurance policy" language of subsection (B). We again disagree with appellee. This part of the subsection applies the offset to "[a]ny person . . . who is insured under more than one policy." An "insured" is "any person covered by the insurance policy, including the named insured." State Farm Mut. Auto. Ins. Co. v. Lindsey, 180 Ariz. 456, 885 P.2d 144 (App.1994), vacated on other grounds, 182 Ariz. 329, 897 P.2d 631 (1995). Here, appellant may be an "insured" only with respect to the underinsurance coverage. The other two coverages under which she seeks recovery, that of Sroka's liability policy and her mother's liability policy, are third-party liability claims. Therefore, she is not a person "insured" as to the liability provisions of the respective policies.
We conclude that subsection (B) does not apply. Consequently, we turn our analysis to subsection (C), the only other subsection with possible applicability. This subsection states:
Where more than one policy may be applicable, a policy issued by the insolvent insurer shall be deemed to be excess coverage. The claimant shall be required to exhaust all rights under other applicable coverage or coverages. Any amount payable on a covered claim shall be reduced by the amount of such recovery under other applicable insurance.
It appears that one purpose of the "excess coverage" language in subsection (C) is to protect the fund by prioritizing coverage. Under this subsection, primary insurance coverage of a solvent insurer retains its character as primary, and any Fund coverage is treated as excess. Essentially, this part of the subsection dictates the order of recovery.
We also note, however, that the first clause of subsection (C) does appear to encompass the situation we have here; namely, more than one applicable policy. We acknowledge that this reading is not unambiguously clear and requires an interpretative process to determine whether such a conclusion is plausible. We turn now to that process, keeping in mind that our primary function in construing statutes is to attempt to ascertain the intent of the legislature. State v. Korzep, 165 Ariz. *746 490, 493, 799 P.2d 831, 834 (1990). In so doing, we consider the statute's spirit and purpose, the language used, its effects and consequences, and the context of the statute itself. Id. If we find that a part of a statute is susceptible to more than one construction, we will adopt that which is consistent with the general import of the statute. City of Prescott v. Randall, 67 Ariz. 369, 377, 196 P.2d 477, 482 (1948).
Our consideration of these principles of construction leads us to conclude that the legislature did intend the first clause of the subsection to include the scenario presented here. First, the language "[w]here more than one policy may be applicable" is easily susceptible to that reading. Second, we think it fair to presume that the legislature, in enacting the guaranty fund statutes, intended to include all possible combinations of parties, insurers, and insurance coverages to accomplish its overall goal of protecting its citizenry against insurer insolvency. In such a context, it is easier to use "catch-all" phraseology, as here, rather than attempt to detail all possible variations.
The alternative to reading the subject phrase as inclusive is to read our scenario as being completely outside the scope of the nonduplication clause. The Fund would still be liable for payment of claims presented under our scenario, pursuant to section 20-664(A)(1), yet would be deprived of the protection to its financial integrity that the nonduplication clause affords. While the numbers in the instant case obviously pose no threat of this nature, we include in our construction of the "effects and consequences" of a statute the future impact our construction may have, not just the impact it may have on the particular facts presented. Viewed in this light, we readily conclude that the legislature did intend subsection (C) to implicate the nonduplication mechanism when the policies of two insolvent insurers apply to a covered claim.
We turn now to the operation of the nonduplication mechanism in this case. No analysis is required to find that the trial court erred in determining that appellee was entitled to a limit-against-limit offset. Such an offset scheme was expressly rejected by the Herder court when it determined that subsection (C) required an offset against the "total amount payable as damages for the claimant's injuries caused by the covered occurrence," rather than an offset against policy limits. 156 Ariz. at 207, 751 P.2d at 523. Since the total damages here exceed the combined policy limits, no duplication of recovery is possible and the Fund is liable to appellant under both policies.
Because we have found subsection (C) applicable, we anticipate on remand a question as to how the "excess coverage" mechanism of the subsection may affect the Fund's liability to appellant. The same question was addressed in a non-guaranty context by the Ninth Circuit in Weekes v. Atlantic Nat'l Ins. Co., 370 F.2d 264 (9th Cir.1966). There, the tortfeasor was covered by two insurance policies which both contained "excess clauses." The court determined that, when two applicable policies contain excess clauses, these clauses "offset each other" and "each insurer must bear its portion of the loss in proportion to the limits of the policy." Id. at 274.
We see no reason not to apply this same rationale here. Prior to their respective insolvencies, Great Plains and Old Hickory were both primary insurers under their respective liability coverages for this incident. Upon insolvency, each became excess, but only to any other applicable policy written by a solvent insurer. Since there is no such insurer, each now occupies primary status and must, through the Fund, bear its respective portion of the loss in proportion to the policy limits. Ordinarily, since the limits on each policy are the same, each policy would bear 50% of the loss up to policy limits. Here, however, there exists a prior fault apportionment of 60%, or $39,000, against Sroka under the Great Plains policy and 40%, or $26,000, against appellant's mother under the Old Hickory policy. This percentage of fault apportionment will substitute for the policy limits comparison calculation and govern the loss bearing responsibility of the respective policies.

III. Attorneys' Fees
The attorneys' fees awarded in this case were based on the alleged settlement *747 agreement. The Fund requested $20,929.50 in attorneys' fees pursuant to A.R.S. section 12-341.01(A) for its defense of appellant's breach of contract claim. Appellant argued to the trial court that the request was improperly inflated and asked the court to reduce the amount requested to reflect "reasonable" fees. The trial court awarded the Fund $10,000 as "a contribution towards attorney fees."
On appeal, appellant argues that the trial court should have denied the Fund's request for attorneys' fees altogether based on the factors set forth in Wagenseller v. Scottsdale Memorial Hosp., 147 Ariz. 370, 394, 710 P.2d 1025, 1049 (1985).[6] However, appellant has not indicated how the trial court abused its discretion in its award. We find that, based on the factors enumerated in Wagenseller, the trial court's award was appropriate.

CONCLUSION
We affirm the trial court's order finding that there was no enforceable settlement agreement between appellant and Old Hickory. We reverse the trial court's order which found that section 20-673(B) is applicable to appellant's claim and remand for proceedings consistent with this decision. Because the Fund remains the prevailing party on the contract issue, we affirm the award of attorneys' fees pursuant to section 12-341.01.[7] In the exercise of our discretion, and after considering the factors set forth in Wagenseller, we deny appellee's request for attorneys' fees incurred in the defense of this appeal.
VOSS and EHRLICH, JJ., concur.
NOTES
[1] The fund actually paid appellant $15,000 less the $100 statutory fee prescribed by A.R.S. section 20-667(B). The statutory fee calculation will be hereafter omitted.
[2] As with Great Plains, the Fund succeeded Old Hickory after it was declared insolvent.
[3] Appellant also claims that the Fund did not produce "[s]ubsequent orders from the Louisiana court, communications from the Louisiana Insurance Commissioner to Old Hickory regarding claim settlements, and the Old Hickory claim file itself." She argues that because this information was readily available to the Fund, the trial court should have presumed the information would be adverse to the Fund.

However, appellant had an equal opportunity to secure such evidence herself from Louisiana. Moreover, if she thought the Fund had the material, she could have moved the trial court to compel the Fund to disclose the documents pursuant to Rule 37(a), Arizona Rules of Civil Procedure. However, she failed to do either. In these circumstances, then, no factual presumption adverse to the Fund is appropriate.
[4] An issue which will have to be addressed by the trial court on remand concerns how payment, if any, under the underinsurance clause of the Old Hickory policy is to be made. For a discussion of the problems arising under nonduplication statutes and underinsurance clauses, see Note, Insurance Company Insolvencies and Insurance Guaranty Funds: A Look at the Nonduplication of Recovery Clause, 74 Iowa L.Rev. 927 (1989).
[5] See Note, supra, note 4, at 929.
[6] Appellee argues that appellant raises Wagenseller for the first time on appeal. This is incorrect. Appellant raised the issue at the trial court in her reply in support of objection to appellee's application for attorney's fees.
[7] While we reverse the trial court's award of summary judgment based on the offset interpretation, this does not necessitate vacating the award of attorneys' fees. The right to insurance payment is based on contract principles; the right to payment of a claim by a guaranty is statutory. 19A J. Appleman, Insurance Law and Practice, section 10,801, at 364 (Supp.1995). By virtue of our decision upholding the trial court's grant of summary judgment regarding the settlement agreement, the Fund remains the prevailing party on that issue.